240 So.2d 137 (1970)
M.L. WILSON and Gertrude Wilson
v.
ST. REGIS PULP & PAPER CORPORATION.
No. 45785.
Supreme Court of Mississippi.
May 25, 1970.
Rehearing Denied October 19, 1970.
*138 Jones & Patterson, Brookhaven, for appellants.
Simrall, Aultman & Pope, Hattiesburg, J.P. Patterson, Monticello, for appellee.
INZER, Justice.
This case involves a riparian boundary dispute between appellants, Mr. M.L. Wilson and Mrs. Gertrude Wilson, and appellee, St. Regis Pulp & Paper Corporation. Appellee filed a bill of complaint in the Chancery Court of Lawrence County seeking to confirm its title to the land in dispute. Appellants answered and denied that appellee owned the land in dispute and filed a cross bill seeking damages for the removal by appellee of sand and gravel from the land. We affirm.
The Pearl River is the boundary line between a tract of land owned by appellants and a tract of land owned by appellee. Appellants' land lies west of the river and appellee's land lies east of the river. During the years a sand bar built up in the river. It extended from the east bank of the river out into the river. During the year 1966 appellee removed a considerable quantity of sand and gravel from the sand bar which it used in the construction of its plant in Lawrence County. Appellants demanded damages, contending that a part of the sand and gravel was removed from their property. Strange as it may seem, both parties agree that the thread of the stream of Pearl River is the dividing line between their properties. Appellants contend that the thread of the stream means the line midway between the opposite shore lines when the water is at its ordinary stage, neither swollen by freshets nor sunken by droughts, with no account being taken of the main channel, current or line of greatest depth. On the other hand, appellee contends, and the chancellor found, that the thread of the stream is the center of the stream being the thalweg or deepest portion of the channel.
Appellants concede that if the chancellor was correct in holding that the dividing line between their land and the land of the appellee is the thread of the current or the thalweg, then all the sand and gravel removed was removed from appellee's property.
The chancellor in reaching his conclusion evidently relied upon our holding in Robinson v. Humble Oil & Refining Co., 253 Miss. 602, 176 So.2d 307 (1965), wherein we held that where a stream is the boundary between properties this boundary shifts with the gradual vagrancies and changes of the stream. In so holding we quoted with approval Anderson-Tully Co. v. Tingle, 166 F.2d 224 (5th Cir.1948). There the Court said:
The law stated as conclusions (1) and (2) is unquestionably correct. While controversies between States as to their boundaries are within the original jurisdiction of the Supreme Court and are to be settled by it, so that private land titles cannot ignore the boundary so established, State of Arkansas v. State of Tennessee, 246 U.S. 158, 38 S.Ct. 301, 62 L.Ed. 638, L.R.A. 1918D, 258, there has never been any difference of view between the Supreme Court of the United States and that of Mississippi, that the thread of the stream or the thalweg is to be recognized. Hill City Compress Co. v. West Kentucky Coal Co., 155 Miss. 55, 122 So. 747. The doctrine of State of Arkansas v. State of Tennessee as to change of boundary by slow, non-avulsive changes in the thalweg is also the law *139 of Mississippi. See cases below. There is nothing in this case to prevent the ordinary application of Mississippi law to these private owners of Mississippi land.
The law of Mississippi as to boundaries by freshwater streams above the ebb and flow of the tides is the common law, regardless of the size and actual navigability of the streams; and that law is that the owners of the land own to the thread of the current of the stream, assumed in the absence of other proof to be the center line of the stream; but that the boundary shifts with gradual non-avulsive changes in the stream, so that an owner may lose or gain an indefinite area thereby. The underwater private ownership is of course subject to the public right of navigation. Morgan and Harrison v. Reading, 1844, 3 Smedes & M. 366; Steamboat Magnolia v. Marshall, 39 Miss. 109; Wineman v. Withers, 143 Miss. 537, 108 So. 708; United States Gypsum Co. v. Reynolds, 196 Miss. 644, 18 So.2d 448. See also our decisions touching the Mississippi law in Cox v. Phillips, 5 Cir., 277 F. 414, and Iselin v. La Coste, 5 Cir., 139 F.2d 887.
Appellants admit that the rule announced in Anderson-Tully, supra, is the applicable rule in this state where the stream is the dividing line between states, but contend that the court was in error in holding that it was the law of this state relative to fresh water streams above the ebb and flow of the tide which lie wholly within the boundaries of this state. We have carefully considered their argument and the cases cited in support thereof, but we think that our holding in Robinson v. Humble Oil Co., supra, is contrary to this contention and is decisive of this question.
The evidence in this case supports the finding of the chancellor as to the location of the thalweg or the deepest part of the channel, and for this reason we are of the opinion that this case should be affirmed.
Affirmed.
ETHRIDGE, C.J., and RODGERS, BRADY and ROBERTSON, JJ., concur.
RODGERS, Justice.

ON PETITION FOR REHEARING
The Petition for Rehearing is denied. All Justices concur except Justices JONES and PATTERSON, who took no part in the case, and Justice RODGERS, who dissents.
RODGERS, Justice (dissenting).
I concurred in our original opinion in this case because I was of the impression that an island was involved, which involves a different legal principle; but, since I have restudied the issues involved, I am constrained to comment upon the legal aspect of the title to land bounded by a body of water. I am convinced that we have traveled a legal avenue parallel with, and adjacent to, the true route in going to the answer to the problem involved. Consequently, we have apparently adopted a legal formula, foreign to this jurisdiction, sometimes called the "Erie doctrine," but more properly called the "thalweg rule."
The term "thalweg" or "downway" is the track taken by boats in their course down the stream. State of New Jersey v. State of Delaware, 291 U.S. 361, 54 S.Ct. 407, 78 L.Ed. 847 (1934). It is commonly used by writers on international law in definition of water boundaries between states. Thalweg means the middle or deepest and most navigable channel. It is said that the word "thalweg" has been adopted by many languages. It is German, meaning "valley-way" (Anderson-Tully Co. v. Tingle, 166 F.2d 244 [5th Cir.1948]), and is often styled "fairway," "midway" or "main channel." The meaning of "thalweg" came home to Mississippi in the case of State of Louisiana v. State of Mississippi, 202 U.S. 1, 26 S.Ct. 408, 50 L.Ed. 913 (1906). In that case the boundary of Mississippi was determined, by the thalweg, to be the deepwater sailing *140 channel emerging from the mouth of the Pearl River and extending eastward to the north of Half Moon Island through the Mississippi Sound and Cat Island Pass between Cat Island and Isle `a Pitre, and through Chandeleur Island Sound northeast of the Chandeleur Islands to the Gulf of Mexico.
The Court went at length to point out that in treaties, with reference to the boundaries beween the properties of European nations in the new world, that:
* * * In international law, therefore, and by the usage of European nations, the term "middle of the stream" as applied to a navigable river, is the same as the middle of the channel of such stream, and in that sense the terms are used in the treaty of peace between Great Britain, France and Spain, concluded at Paris in 1763. * * * (202 U.S. at 50, 26 S.Ct. at 421, 50 L.Ed. at 931)
It was finally decided in Hill City Compress Co. v. West Kentucky Coal Company, 155 Miss. 55, 122 So. 747 (1929), that the boundary between Mississippi and Louisiana was the "thalweg" and not a midway point between the banks of the river.
The southern boundary of Mississippi was again mentioned in Anderson-Tully Co. v. Tingle, supra. In that case the Federal Court said that:
The law of Mississippi as to boundaries by freshwater streams above the ebb and flow of the tides is the common law, regardless of the size and actual navigability of the streams; and that law is that the owners of the land own to the thread of the current of the stream, assumed in the absence of other proof to be the center line of the stream; * *. (166 F.2d at 227)
This case also recognizes that neither the Mississippi River nor the Yazoo River would be navigable streams under the common law.
The trouble with Anderson-Tully v. Tingle, supra, is that the opinion does not recognize that the Mississippi River is an interstate, and in effect, an international boundary (State of Iowa v. State of Illinois, 147 U.S. 1, 13 S.Ct. 239, 37 L.Ed. 55 [1893]), while the Yazoo River is wholly intrastate and is not within the ebb and flow of the tide. Assuming that the "flumen aqua" or "thalweg" rule was applied because the Yazoo River is considered to be a navigable stream at its mouth, and as such the Court applied the civil law (People v. Canal Appraisers, 33 N.Y. 461 [1865], which theory is not apparent), nevertheless, the "thalweg" rule is not applicable to land bounded by freshwater streams within this state. Robinson v. Humble Oil & Refining Co., 253 Miss. 602, 176 So.2d 307 (1965). More will be said about Robinson later.
The reason for the "thalweg" rule in international law rests upon equitable consideration and is intended to safeguard each state to equal access and right of navigation in a boundary stream. State of Arkansas v. State of Tennessee, 310 U.S. 563, 60 S.Ct. 1026, 84 L.Ed. 1362 (1940).
There can be no doubt that the common law, except as modified by statute, prevails in Mississippi. Western Union Telegraph Co. v. Goodman, 166 Miss. 782, 146 So. 128 (1933); Interstate Life & Accident Co. v. Pannell, 169 Miss. 50, 152 So. 635 (1934). This is particularly true as to land title bounded by water, as will be seen later. What, then, are the common law rules?
It will be remembered as we proceed that England does not have large navigable rivers and lakes such as are found in North and South America. Beginning, therefore, with the tide lands under the common law, property boundaries extended to the line of the ordinary high tide between the Springs and Neaps. The soil of the shore belonged to the King subject to the public right of piscary. The King owned the beds of all rivers as far as the flow of the tide extended. 12 Am.Jur.2d Boundaries § 20, p. 562 (1964).
*141 Under the common law it was presumed that the title of the grantee of lands bordering on a non-navigable river or water course, the bed of which belongs to the upland owners, would be considered to extend to the thread of the stream. 8 Am.Jur. Boundaries § 23, p. 762 (1937); Anno. 74 A.L.R. 597, 599 (1931).
What is meant by thread of the stream? Professor Skelton, in his book on The Legal Elements of Boundaries and Adjacent Properties, at page 311, has this to say:
The thread of a stream or river when called for as a boundary line is the middle line between the shores, irrespective of the depth of the channel, taking them in the natural and ordinary stage of the water, at medium heights, neither swollen by freshets or shrunk by droughts. It is irrespective of the channel which may lie on either side of the thread, and is determined solely by establishing the mid line between shores at the natural and ordinary stage of the water, * * *.
Citing: State v. Muncie Pulp Co., 119 Tenn. 47, 104 S.W. 437 (1907); Warren v. Thomaston, 75 Me. 329, 46 Am.Rep. 397 (1883).
Professor Grimes of Indiana University School of Law, in the third edition of Clark's Law of Surveying and Boundaries, section 621 (1959) has this to say at page 722:
By the "thread of the stream," strictly speaking, is meant the center of the main channel of the stream. Ordinarily, the middle line between the shores is regarded as the thread of the stream, taking it in the natural and ordinary stage of the water, irrespective of the depth of the channel. Moreover, it is the middle line of the stream for the time being that is the boundary. The boundary line may change from time to time by the gradual wearing away of the bank upon one side of the stream and the depositing of the soil upon the opposite side, and the land before covered by water belongs to the riparian proprietor, though, if the bed of the stream be suddenly changed by a freshet, the boundary is not changed; the ownership remains according to former bounds.
It is said by the textwriter of 12 Am.Jur.2d Boundaries section 28, page 569 (1964), with reference to the thread of a stream:
The thread of a stream which frequently is the boundary line between owners of land bordering on either side of the watercourse has generally been held to be the middle line between the shores, irrespective of the depth of the channel, taking it in the natural and ordinary stage of the water, at its medium height, neither swollen by freshet nor diminished by drought. * * *
This rule has been thoroughly catalogued in 74 A.L.R. 599 (1931), 72 Am.St.Rep. 280 (1899), 27 Am.St.Rep. 58 (1891), 21 Eng. Rul.Cas. 605 (1900), 23 Eng.Rul.Cas. 183 (1901).
There are two fine opinions in two early New York cases which show the universal use of the common law doctrine of property ownership by riparian owners of land to the thread of the stream. In Smith v. City of Rochester, 92 N.Y. 463 (1883), the court said, at page 473:
The riparian owners of lands adjoining freshwater, non-navigable streams, take title, "ad usque filum aquae," to the thread of the stream, and thereby acquire the right as incident to such title to the usufructuary enjoyment of the undiminished and undisturbed flow of such water. * * *
In People v. Canal Appraisers, supra, the Court gave a history of the thread of the stream doctrine, but pointed out that New York reserved the bed of navigable streams for the use of the public as differentiated from freshwater, non-navigable streams *142 where the bed of the stream belonged to the riparian landowners.
There can be little question as to what the common law rule was with reference to ownership of upland property adjacent to freshwater streams. Mississippi, as I see it, is not only bound by the common law doctrine as a common law state, but has specifically adopted the common law thread of the stream doctrine by our cases, as opposed to the depth of the channel or thalweg of the stream.
The early case of Steamboat Magnolia v. Marshall, 39 Miss. 109 (1860), involved the charge of a riparian proprietor for wharfage or for the use of his land adjacent to the Mississippi River at Vicksburg by steamboats. The Steamboat Magnolia refused to pay the wharfage fee upon the theory that the river banks between high and low water marks (although the land had been graded for use) did not belong to the riparian owner, but belonged to the public to be fully used by all who chose to do so. The Court said, after an exhaustive study of the cases:
It will thus be seen that so far as the weight of authority is to be considered in the United States, the cases in Pennsylvania and North Carolina, founded on their peculiar policy and laws, one case in Alabama and one case in Iowa, both without reasoning or authority to sustain them, are the only cases in which the common law rule has been questioned; while in nearly all the other States, and in many of them after the most mature and thorough consideration and research, the common law rule has been fully sustained.
* * *
* * * * * *
We have already seen that there is not a case to be found, either English or American, which doubts or disputes that by the common law of England the right of the riparian owner, on the banks of freshwater streams, extends to the middle of the stream, subject always to the public right of free navigation.
On the principle that we sit jus dicere non jus dare, the common law rule must control us until changed by legislation. (39 Miss. at 130, 131)
Thus, the Court adopted the common law rule and extended the ownership of the riparian landowner to the center of the Mississippi River.
In the case of Morgan v. Reading, 3 Smedes & M. 366 (1844), Reading owned land in Vicksburg bordering the Mississippi River. The defendants, Morgan and Harrison, were flatboat traders on the River and took charge of and used the land below high water mark on the property of Reading. They claimed the public owned the property below high water mark and they could not be required to pay for the usage of the land. The Court, speaking through Justice Sharkey, pointed out that American decisions generally conform to the common law doctrine with reference to the property boundary of riparian landowners and stated that "The common law rule admits no modification in consequence of the magnitude of a river." The Court held:
* * * On rivers not navigable, the riparian proprietor, by construction of the Common Law, owns to the thread of the stream, unless restricted by the grant; * * *. (3 Smedes & M. at 406)
In the case of New Orleans M. & C.R. Co. v. Frederic, 46 Miss. 1 (1871), the Court reviewed the foregoing cases and again recognized the right of a riparian landowner to the land under adjacent water even as to a navigable stream.
In the case of State ex rel. Rice v. Stewart, 184 Miss. 202, 184 So. 44 (1938), this Court again reviewed the cases with reference to the common law rights of riparian landowners. In that case the question involved the right of an upland owner to take sand and gravel from certain *143 tidewater lands. The Court followed the common law and held that the state is the owner of the title of the soil and of minerals therein contained under the water of Mississippi wherever the tide ebbs and flows. The Court then pointed out that, by previous authority of this State, we held that:
* * * "There is a material difference between rivers which are navigable, and those which are not navigable, according to the Common Law meaning of the term. On rivers not navigable, the riparian proprietor, by construction of the Common Law, owns to the thread of the stream, unless restricted by the grant." * * * (184 Miss. at 225, 184 So. at 47)
The Court also said that, under the cases previously cited here, since the riparian owner owns the bed of navigable freshwater streams to the center thereof, this establishes a rule of property.
It is, therefore, abundantly clear to me that Mississippi has adopted the common law doctrine that riparian owners own land to the thread of the water as defined by the common law authorities.
It is contended, however, that since we cited the federal case of Anderson-Tully Co. v. Tingle, supra, in Robinson v. Humble Oil & Refining Co., supra, we must have adopted the middle of the current doctrine. The Anderson-Tully opinion recognizes the common law rule in Mississippi to be "that the owners of the land own to the thread of the current of the stream, assumed in the absence of other proof to be the center line of the stream." The part added to the common law doctrine is the use of the words "the current of" the stream. This is not what is meant by the thread of the stream and Anderson-Tully merges the thalweg rule with the common law rule of the "thread of the stream."
A careful study of Anderson-Tully indicates the merging of the common law rule of thread of the waters and the international civil rule of the center line of navigable streams as to boundaries.
The muddling confusion and merger of these distinct doctrines is perhaps brought about because of the similarity of the Latin words "filum," meaning "thread," and "flumen," meaning "stream." The Latin idiom "ad medium filum aquae" is the common law doctrine meaning "to the middle thread of the waters." An entirely different meaning is had when the Latin idiom "ad medium flumen" is used because the meaning is then changed to "the middle of the current of water." The first Latin idiom is clearly the common law rule while the second is the international boundary or "thalweg" doctrine. The two doctrines are incompatible because the "thread" of the waters may or may not be the middle of the "current."
Since it is obviously true that Anderson-Tully, supra, erroneously merged the two doctrines, the mere fact that we quoted this case in our opinion in Robinson v. Humble Oil & Refining Co., supra, does not in my opinion overrule the cases previously decided by this Court in which we gave sanction to the common law thread of the stream doctrine.
Landmarks have always been sacred. It has been said of old: "Remove not the ancient landmark, which thy fathers have set." Proverbs 22:28. I prefer to uphold and sustain the ancient landmarks of the law so as to follow the well-beaten path used and accepted by our forefathers by which they have determined the boundaries of their land. The maxim, "stare decisis et non quieta movere"  to stand by precedents and not to disturb what is settled  has been accepted by all civilized systems of judicature. This doctrine was the cornerstone of the English Common Law which brought stability to the law, not only to English speaking people, but to all civilization. The doctrine is simple; it is that when a point of law is once clearly decided by a court of final jurisdiction, it becomes a fixed rule of law to govern the *144 future actions of the judiciary. When property rights are once fixed they cannot be disturbed without great injustice to property owners who have based their action upon the doctrine established by the courts.
I am convinced that in the instant case we are changing land law that has come down to us from antiquity. For that reason, I am constrained to dissent from the majority holding. I would reverse the decree of the trial court.